**FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

_____

No. 24-10913

_____

DECLAN FLIGHT, INC.,
RIGHT RUDDER AVIATION, LLC,

Plaintiffs-Appellants
Cross-Appellees,

*versus*

TEXTRON EAVIATION, INC.,
TEXTRON, INC.,

Defendants-Appellees
Cross-Appellants.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 5:23-cv-00301-GAP-PRL

_____

Before LUCK, LAGOA, and ABUDU, Circuit Judges.

LAGOA, Circuit Judge:

This case is about alleged tortious interference with three separate contracts. In 2020, Declan Flight, Inc., contracted with a subsidiary of Pipistrel d.o.o., a Slovenian aircraft manufacturer, to serve as its chief sales representative in the United States. A year later, Right Rudder Aviation, LLC, contracted with another Pipistrel subsidiary to become its exclusive distributor in the United States. For a while, these business relationships flourished, with Declan and RRA's contributions accounting for up to 90% of Pipistrel's total sales. However, in 2022, Textron, Inc. purchased Pipistrel and brought it under the umbrella of its subsidiary Textron eAviation, Inc. Although Textron initially promised that it would continue to rely on Declan and RRA for business, such promises soon proved empty. Within a year of acquiring Pipistrel, Textron and eAviation had essentially cut all business ties with Declan and RRA.

Declan and RRA sued Textron and eAviation for tortiously interfering with their respective contracts with Pipistrel (Counts I and II), as well as with a separate sales agreement between RRA and Mesa Airlines for the purchase of Pipistrel aircraft (Count III). The district court dismissed the Plaintiffs' claims based on their contracts with Pipistrel for *forum non conveniens*, concluding that the Defendants—despite not being a party to those contracts—could nonetheless enforce the contracts' forum-selection clauses channeling litigation to Slovenia under the federal common law doctrine of equitable estoppel. As to RRA's claim alleging tortious

interference with the Mesa deal, the district court found that while RRA had adequately alleged personal jurisdiction over the Defendants it had failed to state a viable claim and dismissed this claim as well.

On appeal, the Plaintiffs argue that the district court erred by conducting its analysis under the modified *forum non conveniens* test announced by the Supreme Court in *Atlantic Marine Construction Co. v. U.S. District Court for the Western District of Texas*, 571 U.S. 49 (2013), which only applies when a valid forum-selection clause reaches the claims plead. In their view, the contracts' forum-selection clauses are not applicable here because their contracts with Pipistrel are governed by Slovenian law, which does not recognize non-signatory enforcement under these circumstances. RRA also maintains that it plausibly alleged tortious interference with the Mesa sales contract in Count III. The Defendants cross-appeal the district court's finding of personal jurisdiction on that claim as well.

After careful review and with the benefit of oral argument, we reverse the dismissal of Counts I and II for *forum non conveniens*, reverse the district court's finding of personal jurisdiction as to Count III, and remand for further proceedings.

## I.     FACTUAL AND PROCEDURAL BACKGROUND[1]

Appellant Declan Flight, Inc. ("Declan") is an Arizona corporation specializing in aviation management. Appellant Right

---

[1] Because this case comes to us on a motion to dismiss, our discussion of the facts comes from the allegations in the second amended complaint.

Rudder Aviation, LLC ("RRA") is a Florida limited liability company that works as a "full-service aerospace firm providing services such as airport management, flight training, maintenance facilities, aircraft sales and aircraft management." From 2020 to 2022, Declan and RRA spearheaded sales in the U.S. market for Slovenian aircraft manufacturer Pipistrel d.o.o. ("Pipistrel"). At their peak, they managed 90% of Pipistrel's total sales. But in April 2022, Textron, Inc. ("Textron") acquired Pipistrel and put Pipistrel under the control of its newly incorporated subsidiary, Textron eAviation, Inc. ("eAviation"). Having integrated Pipistrel into their network of aircraft marketing and distribution, Textron and eAviation no longer had any need for Declan or RRA. So, despite its existing contracts with Declan and RRA, Pipistrel soon terminated those agreements, cutting Declan and RRA out of owed and expected commissions.

### 1.    The Declan Contracts

On October 2, 2020, Declan entered into a contract with Pipistrel Vertical Solutions d.o.o. ("Pipistrel Vertical"), a Pipistrel subsidiary, to serve as an "independent entrepreneur" and chief sales representative for special products and engineering services in the United States (the "2020 Declan Contract"). Under the 2020 Declan Contract, Declan was "required to spearhead the sales of the Pipistrel products and provide sales support services." In exchange, Declan would receive a monthly payment of €12,000, plus a 5% commission on all sales. The 2020 Declan Contract provided it

would expire on October 1, 2021, but that it could be renewed by mutual consent of the parties.

By all accounts, both Declan and Pipistrel were initially satisfied with their business relationship. Ivo Boscarol, Pipistrel's founder and chairman, told Declan about a year into their venture that Pipistrel was "really happy" with the firms' cooperation and that he was "convinced" they "will be very successful together also in the future." Declan and Pipistrel Vertical renewed their agreement in November 2021 for the three-year term between January 1, 2022, and December 31, 2024 (the "2022 Declan Contract"). The terms of the 2022 Declan Contract were similar to those of the prior agreement: Declan would continue to work for Pipistrel Vertical in a business-development and sales role; it would now receive a fixed hourly rate; and it would continue to receive a 5% commission on its sales and expense reimbursements for its services. A party could unilaterally terminate the contract only if the counterparty was late in complying, or failed to comply, with its contractual obligations and did not cure its breach within a reasonable time following notice thereof. The contract also would automatically terminate if "cooperation of the Contracting Parties becomes impossible in any way."

The 2022 Declan Contract contained the following forum-selection provision:

> Any controversial relations arising from this or in connection with this contract will be settled primarily by the contracting parties by mutual consent, otherwise

the dispute shall be settled by the court having juris-
diction over the seat of the Contracting Authority.

The "Contracting Authority" refers to Pipistrel Vertical, which is
headquartered in Slovenia.

### 2. The RRA Contract

On September 27, 2021, RRA contracted with Pipistrel and
its subsidiary, Pipistrel Italia S.r.l, to be the exclusive U.S. distributor
of several Pipistrel aircraft (the "RRA Contract"). The RRA Con-
tract granted RRA the right to purchase these aircraft at discounted
rates from Pipistrel before reselling them to customers, apportion-
ing the discount as a "commission." Although the RRA Contract
was originally set to run for two years, the parties later agreed that
their business relationship would be "maintained . . . with no par-
ticular termination date as long as RRA performed in accordance
with" its contractual obligations. The contract also included a fo-
rum-selection clause, which provided that, "[i]n case of dispute the
courts of Nova Gorica, Slovenia shall have jurisdiction[,]" as well as
a choice-of-law clause dictating that it was "governed by the laws
of Slovenia."

### 3. Textron Acquires Pipistrel and Freezes Out Declan

Soon after inking the 2020 Declan Contract, John Wood, De-
clan's CEO and principal, connected executives at Pipistrel with
Textron, a large aircraft manufacturer headquartered in Rhode Is-
land, "to discuss opportunities and synergies between the two com-
panies." Over the next seventeen months, Pipistrel and Textron
held over thirty meetings to discuss a potential merger between the

two firms.  On March 17, 2022, Textron disclosed in public SEC filings that it intended to purchase Pipistrel and its subsidiaries for approximately €218,000,000, and informed investors of its plan to integrate Pipistrel into Textron's "global aircraft sales and support network."

Two days later, Rob Scholl, a senior vice president at Textron, informally offered Wood a director-level position at eAviation, which at the time was a "business unit of Textron" specializing in "sustainably powered flight."  Wood reminded Scholl that the 2022 Declan Contract remained in effect through 2024 and that he intended to continue managing Declan's business with Pipistrel. On April 1, 2022, Textron formally incorporated eAviation as a new subsidiary corporation that would house the Pipistrel entities following the acquisition.  Scholl became President and CEO of eAviation.  The Textron-Pipistrel deal closed on April 15, 2022, with Textron now owning a 90% stake in the Pipistrel companies.

With Pipistrel officially under Textron's corporate umbrella, Textron and eAviation sought to tie up the loose ends posed by Declan's preexisting contractual relationship with Pipistrel Vertical. On June 6, 2022, Scholl invited Wood to eAviation's headquarters in Kansas under the pretense that Wood would be meeting with "the Textron Special Missions Team to discuss ways that Textron and Declan could work together" on new product lines.  When Wood arrived on site, he was led into a conference room. To his surprise, he was greeted not by the Special Missions Team but by Scholl, who slid Wood a document on eAviation letterhead

purporting to terminate the 2022 Declan Contract. Scholl explained to Wood that "he was terminating [the 2022 Declan Contract] because . . . eAviation did not plan to sell the products Declan was marketing and that the purchase between Textron and Pipistrel was an asset sale." Neither premise was true, it turned out, as Pipistrel continued to sell "the exact products Declan marketed" and the Textron-Pipistrel deal "was not an asset sale."

Scholl also shared with Wood a draft settlement agreement, which offered to pay Declan a lump sum of $100,000, in addition to approximately €230,000 in outstanding commissions. According to Declan, this payoff was "significantly less than what Declan was owed" in commissions. In exchange, Declan would have to release all claims that it had against the "Textron Parties," which Wood took to mean both Textron and eAviation. Wood did not accept Scholl's offer.

### 4.      *The Mesa Contract*

RRA would soon suffer a similar fate as Declan. The day after Textron announced its intent to acquire Pipistrel, Pipistrel sent a memorandum to RRA explaining that it "d[id] not have plans to cancel any agreements" it had with distributors. Scholl also visited RRA's facility in Florida to assure RRA that eAviation intended "to build a strong relationship with RRA" and that RRA was "'needed' . . . for the continued future success of Pipistrel."

Taking Scholl at his word, RRA continued marketing Pipistrel aircraft. Around this time, RRA was approached by Mesa Airlines, a regional airline operating out of Phoenix, Arizona, that was

interested in purchasing a fleet of Pipistrel Alpha Trainer aircraft through RRA. In a July 13, 2022, email, Tadej Hozic, the Pipistrel sales representative who was coordinating the deal with RRA, informed RRA that Pipistrel would sell the planes to RRA at an 18% discount on the first fifty planes, and a 20% discount on the remaining planes. Prior to finalizing the sale, RRA arranged for a meeting with Gabriel Massey (Pipistrel's managing director and president), Scholl, and Mesa. In a follow-up email, Massey, allegedly at the behest of Scholl, expressed concern at the pricing structure. RRA informed Massey that Hozic had already confirmed the discount, and that Mesa had already obtained approval from its board to proceed forward with the transaction.

On August 18, 2022, RRA executed a contract with Mesa Airlines for the sale of twenty-five Pipistrel Alpha Trainer planes, with the option of purchasing an additional seventy-five aircraft (the "Mesa Contract"). The Mesa Contract provided it was to be governed by Florida law, and that "any dispute or claim arising out of [it] . . . shall be filed in the courts of Citrus County, FL." It also stated that "[a]ny dispute arising under, out of, or related in any way to this Agreement or the legal relationship between Seller and Purchaser will be adjudicated solely and exclusively in the Citrus County, Florida, USA," that "[e]ach of the parties consent to the exclusive personal jurisdiction of these courts," and that "by signing this Agreement, [each] waives any objection to venue of these Florida courts."

Even though the Mesa Contract had been signed, Massey continued to pester RRA about the deal's pricing structure. Because RRA wanted to maintain its business relationship with Pipistrel, it remained willing to work with Massey to resolve these "issues." On August 29, Massey sent RRA a new proposed pricing structure and told RRA that Scholl also had ideas about how to restructure the Mesa Agreement. Massey's proposal "greatly reduced" RRA's commission from what was guaranteed in the contract and from what Hozic quoted RRA in July. As a condition to accepting the reduced commission, RRA told Massey that it wanted an immediate three-year extension of the RRA Contract, so that RRA could continue to pursue sales on behalf of Pipistrel "with assurance and confidence." Scholl and Massey told RRA that it would be granted the extension, and that RRA would receive a draft agreement by mid-September.

Behind the scenes, Scholl had begun renegotiating the Mesa Contract directly with Mesa. Mesa also reached out directly to Scott Donnelly, Textron's CEO, to "work out the details of the new contract between Pipistrel and Mesa Airlines for the 100 aircraft." Textron then directed Pipistrel "to negotiate and finalize a new agreement" with Mesa. RRA received the draft extension agreement on September 26, 2022. Much to RRA's dismay, it would no longer have exclusive rights, or even guaranteed rights, over the sale of Pipistrel aircraft under the terms of the new agreement. Rather than accept these terms, RRA engaged counsel and informed Pipistrel that it believed Pipistrel's interference with the Mesa deal constituted a breach of the RRA Contract. On

November 11, 2022, Pipistrel sent RRA a letter terminating the RRA Contract. Three weeks later, Massey forwarded Mesa a revised contract for the purchase of the Alpha Trainers, effectively vitiating the Mesa Contract and cutting RRA out of the deal.

Declan and RRA sued Textron and eAviation in the U.S. District Court for the Middle District of Florida for tortious interference, alleging the Defendants directed Pipistrel and Mesa to breach their contracts with Declan and RRA. After the Plaintiffs filed an amended complaint, the Defendants moved to dismiss. While that motion was pending, the Plaintiffs sought leave to amend their complaint a second time to "address shotgun pleading deficiencies." The district court allowed them to file a second amended complaint, admonishing them that any future shotgun pleadings would be "subject to dismissal with prejudice." In their second amended complaint—the operative complaint—the Plaintiffs assert three counts of tortious interference, with each respectively based on the 2022 Declan Contract, RRA Contract, and Mesa Contract.

The Defendants renewed their motion to dismiss, arguing that the second amended complaint should be dismissed as a shotgun pleading, for lack of personal jurisdiction, and for failure to state a claim. Additionally, they argued that the claims based on the Declan and RRA Contracts (Counts I & II) should be dismissed for *forum non conveniens* in light of those contracts' designation of Slovenia as the appropriate forum.

The district court largely agreed.  In reviewing the motion as to Counts I and II, the district court began by observing that both the Declan and RRA Contracts contained forum-selection clauses directing related litigation to be adjudicated in Slovenia.  Although neither Textron nor eAviation was a party to those contracts, the district court found that they could nonetheless invoke the forum-selection clauses against the Plaintiffs under the federal-common law doctrine of equitable estoppel, which "allows a nonsignatory to enforce the provisions of a contract against a signatory . . . when the signatory . . . relies on the terms of the contract to assert . . . claims against the nonsignatory."  *See Bahamas Sales Assoc., LLC v. Byers*, 701 F.3d 1335, 1342 (11th Cir. 2012).  The district court then concluded that Slovenia provided an adequate alternative forum for these claims and dismissed Counts I and II without prejudice under the doctrine of *forum non conveniens*.

On Count III, the district court was satisfied that the second amended complaint adequately plead personal jurisdiction over Textron and eAviation.  Even so, the court concluded that the Plaintiffs had failed to state a claim for tortious interference based on the Mesa Contract.  In its view, their response brief below did not rebut any of the "Defendants['] arguments that Count III fails to state a claim," which the court took to mean that the Plaintiffs had "conceded" this claim.  The court also expressed in a parting footnote that the second amended complaint was a shotgun pleading because it jointly plead claims against both Defendants without specifying "which of the defendants are responsible for which acts or omissions."  *See Weiland v. Palm Beach Cnty. Sheriff's Off.*, 792 F.3d

1313, 1323 (11th Cir. 2015). Accordingly, the district court dismissed Count III with prejudice.

The Plaintiffs timely appealed the dismissal of the second amended complaint. The Defendants also timely filed a cross-appeal, challenging the district court's conclusion that it had personal jurisdiction over them as to Count III. We consider both the appeal and cross-appeal here.

## II.    STANDARDS OF REVIEW

We review the construction of a written contract, and the enforceability of a contract's forum-selection and choice-of-law provisions, *de novo*. *Nat'l Fire Ins. Co. of Hartford v. Fortune Constr. Co.*, 320 F.3d 1260, 1267 (11th Cir. 2003); *Lipcon v. Underwriters at Lloyd's, London*, 148 F.3d 1285, 1290–91 (11th Cir. 1998). Dismissals for lack of personal jurisdiction and failure to state a claim are also reviewed *de novo*, "accepting the allegations in the complaint as true." *SkyHop Techs., Inc. v. Narra*, 58 F.4th 1211, 1222 (11th Cir. 2023) (citing *Don't Look Media LLC v. Fly Victor Ltd.*, 999 F.3d 1284, 1292 (11th Cir. 2021)). A district court's dismissal for *forum non conveniens* is reviewed for abuse of discretion, "and should be affirmed 'unless we find that the district court has made a clear error of judgment, or has applied the wrong legal standard.'" *AQuate II LLC v. Myers*, 100 F.4th 1316, 1320 (11th Cir. 2024) (quoting *GDG Acquisitions, LLC v. Gov't of Belize*, 749 F.3d 1024, 1028 (11th Cir. 2014)).

## III.    ANALYSIS

The Plaintiffs challenge the dismissal of all three claims for tortious interference. Like the district court, we consider the

claims based on the Declan and RRA Contracts together before turning to RRA's claim based on the Mesa Contract.

### A.    Counts I & II

We begin with Counts I and II, which the district court dismissed for *forum non conveniens* in favor of the Slovenian forum identified in the Declan and RRA Contracts' forum-selection clauses.

"Procedurally, 'the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens*,'" *AQuate*, 100 F.4th at 1322 (quoting *Atl. Marine*, 571 U.S. at 60), which allows a district court to "decline to exercise its jurisdiction when a foreign forum is better suited to adjudicate the dispute," *Fresh Results, LLC v. ASF Holland, B.V.*, 921 F.3d 1043, 1048 (11th Cir. 2019) (citing *Kolawole v. Sellers*, 863 F.3d 1361, 1369 (11th Cir. 2017)). Usually, a district court will dismiss a suit for *forum non conveniens* only if the defendant can establish that "(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his suit in the alternative forum without undue inconvenience or prejudice.'" *Tazoe v. Airbus S.A.S.*, 631 F.3d 1321, 1330 (11th Cir. 2011) (quoting *Leon v. Millon Air, Inc.*, 251 F.3d 1305, 1311 (11th Cir. 2001)). But where "there is a valid forum-selection clause, 'the calculus changes.'" *AQuate*, 100 F.4th at 1322 (alterations adopted) (quoting *Atl. Marine*, 571 U.S. at 63). As the Supreme Court outlined in *Atlantic Marine*, under such circumstances the plaintiff "bears the burden of establishing that transfer

to the forum for which the parties bargained is unwarranted," and the district court "must deem the private-interest factors to weigh entirely in favor of the preselected forum." 571 U.S. at 63–64. Under *Atlantic Marine*'s modified test, a valid forum-selection clause "should be 'given controlling weight in all but the most exceptional cases,'" and "will almost always" merit dismissal for *forum non conveniens* in favor of the designated forum. *AQuate*, 100 F.4th at 1322–23 (quoting *Atl. Marine*, 571 U.S. at 63).

Here, neither Textron nor eAviation was a party to the Plaintiffs' contracts with Pipistrel, and the Plaintiffs never explicitly agreed to adjudicate their claims against Textron or eAviation in Slovenia. Even so, the district court allowed the Defendants to invoke those clauses under the doctrine of equitable estoppel.

According to the district court, "[c]onsideration of whether to enforce a forum selection clause in a diversity jurisdiction case is governed by federal law . . . not state law." *P&S Bus. Machs., Inc. v. Canon USA, Inc.*, 331 F.3d 804, 807 (11th Cir. 2003) (citation omitted). Equitable estoppel, a doctrine recognized in federal common law, "allows a nonsignatory to enforce the provisions of a contract against a signatory" when the signatory "relies on the terms of the contract to assert his or her claims against the nonsignatory" or when the signatory "raises allegations of interdependent and concerted misconduct by both the nonsignatory and one or more of the signatories to the contract." *Byers*, 701 F.3d at 1342 (citing *MS Dealer Serv. Corp. v. Franklin*, 177 F.3d 942, 947 (11th Cir. 1999)). The district court found that the Plaintiffs' claims satisfied either

condition, and thus allowed the Defendants to "enforce the forum selection clause[s]" included in the Declan and RRA Contracts against the Plaintiffs. Applying *Atlantic Marine*'s modified test, the district court concluded that Slovenia provided an adequate and available forum and that the public interest factors did not weigh against that forum adjudicating the matter—and dismissed Counts I and II for *forum non conveniens*.

On appeal, the Plaintiffs argue that the district court erred by applying the *Atlantic Marine* test, believing that the forum-selections clauses are not applicable to their claims. In their view, whether the Defendants may invoke the forum-selection clauses is a matter of contractual interpretation governed not by federal common law but by the substantive law governing the contracts, which they maintain is the law of Slovenia. And because Slovenia law, they argue, only allows signatories to a contract to invoke its forum-selection clause, the Defendants cannot rely on the Declan and RRA Contacts' forum-selection clauses here.

Whether federal common law governs both the enforceability and interpretation of a contract's forum-selection clause is one of first impression for our Court—and one that has divided our sister Circuits. *Compare Albemarle Corp. v. AstraZeneca UK Ltd.*, 628 F.3d 643, 650 (4th Cir. 2010) (applying federal law to both issues), *and Manetti-Farrow v. Gucci Am., Inc.*, 858 F.2d 509, 513 (9th Cir. 1988) (same), *with Firexo, Inc. v. Firexo Grp. Ltd.*, 99 F.4th 304, 324 (6th Cir. 2024) (rejecting application of federal law to interpretive issues), *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 185 (3d Cir. 2017) (same),

*Weber v. PACT XPP Techs., AG*, 811 F.3d 758, 770 (5th Cir. 2016) (same), *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014) (same), *and Yavuz v. 61 MM, Ltd.*, 465 F.3d 418, 430 (10th Cir. 2006) (same). Given that the "question of the scope of a forum selection clause is one of contract interpretation," *John Wyeth & Bro. Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1073 (3d Cir. 1997) (Alito, J.), and that "state law governs issues of contract interpretation," *AFC Franchising, LLC v. Purugganan*, 43 F.4th 1285, 1290 (11th Cir. 2022), we hold that courts must interpret a contract's forum-selection clause just like any other provision—under the substantive law governing the contract. In doing so, we join the "growing trend" among federal courts to recognize "that there are two separate steps to analyzing a forum-selection clause: (1) applicability based on state law (and/or the law of the contract), and (2) enforceability based on federal common law." *Firexo*, 99 F.4th at 322–23.

Applying this rule, we find that Slovenian law—which does not recognize non-signatories' ability to invoke contractual provisions via equitable estoppel—governs the Declan and RRA Contracts forum-selection clauses. Since the non-signatory Defendants cannot invoke those clauses, there is no "valid forum-selection clause" applicable to the Plaintiffs' claims, meaning the district court had no reason to apply *Atlantic Marine*'s modified *forum non conveniens* test. Therefore, because the district court applied the wrong legal standard, it necessarily abused its discretion in dismissing Counts I and II for *forum non conveniens*.

Our analysis proceeds in five steps. First, we explain how issues implicating a forum-selection clause's "applicability" are distinct from, and antecedent to, issues of its "enforceability." Second, we conduct an *Erie*[2] analysis to establish that defining the applicability of a forum-selection clause poses a substantive issue that cannot be governed by federal common law. Third, applying Florida's choice-of-law rules, we find that the Declan and RRA Contracts, including their forum-selection clauses, are governed by Slovenian law. Fourth, we consider the parties' submissions on Slovenian law and determine that Slovenian law does not allow the non-signatory Defendants to invoke the forum-selection clauses. Finally, having found that the forum-selections clauses are not applicable in this case, we conclude that the district court erred by relying on *Atlantic Marine* to exclude the relevant private-interest factors from its *forum non conveniens* analysis. We take each step in turn.

1.

We have long recognized that the "enforceability of forum-selection clauses is governed by federal law." *AQuate*, 100 F.4th at 1323 (first citing *P&S Bus. Machs.*, 331 F.3d at 807; then citing *Great Lakes Ins. SE v. Raiders Retreat Realty Co.*, 601 U.S. 65, 71–72 (2024)); *accord Stewart Org., Inc. v. Ricoh Corp.*, 810 F.2d 1066, 1067 (11th Cir. 1987) (en banc), *aff'd and remanded*, 487 U.S. 22 (1988). But, as the Plaintiffs see it, this case is not about the *enforceability* of forum-selection clauses but rather their threshold *applicability* to the

---

[2] *Erie R. Co. v. Tompkins*, 304 U.S. 64, 71 (1938).

claims presented here.  Before proceeding any further then, we must define our terms and determine the extent to which these concepts are analytically distinct.

Courts have not always spoken with precision when analyzing forum-selection clauses.  *See* Matthew J. Sorensen, Note, *Enforcement of Forum-Selection Clauses in Federal Court after* Atlantic Marine, 82 Fordham L. Rev. 2521, 2546–47 & n.227 (2014); *see also Barnett v. DynCorp Int'l, L.L.C.*, 831 F.3d 296, 302 (5th Cir. 2015) ("[W]e do not appear to have drawn his distinction between validity and enforceability, instead seeming to treat those words as synonyms in the forum-selection clause context.").  As we recently observed, "[o]ur cases have inconsistently used the terms 'valid' and 'enforceable' . . . without explaining whether, or how, these terms differ." *AQuate*, 100 F.4th at 1323 n.4 (first citing *Krenkel v. Kerzner Int'l Hotels Ltd.*, 579 F.3d 1279, 1281 (11th Cir. 2009); then citing *Turner v. Costa Crociere S.p.A.*, 9 F.4th 1341, 1345 (11th Cir. 2021)).

In general, we have referred to a forum-selection clause's "enforceability" or "validity" when "articulating the effect" of the test announced in *M/S Bremen v. Zapata Off-Shore Co.* (*The Bremen*), 407 U.S. 1 (1972), on forum-selection clauses.  *AQuate*, 100 F.4th at 1323 n.4.  In *The Bremen*, the Supreme Court explained that a court should "enforce [a] forum clause specifically unless [the plaintiff] could clearly show that *enforcement* would be unreasonable and unjust, or that the clause was *invalid* for such reasons as fraud or overreaching." 407 U.S. at 15 (emphases added).  To answer those questions, we have looked to federal common law, and will

"invalidate"—that is, refuse to enforce—a forum-selection clause if "(1) its formation was induced by fraud or overreaching; (2) the plaintiff would be deprived of its day in court because of inconvenience or unfairness; (3) the chosen law would deprive the plaintiff of a remedy; or (4) enforcement of the clause would contravene public policy." *AQuate*, 100 F.4th at 1322 (quoting *Krenkel*, 579 F.3d at 1281). Although both "enforceability" and "validity" are included in *The Bremen* test, it appears that these concepts may describe different characteristics of a forum-selection clause: *The Bremen* test frames each concept as turning on different circumstances, conditioning the former on whether giving effect to the clause would be "unreasonable and unjust," and the latter on whether the clause was the product of "fraud or overreaching." *The Bremen*, 407 U.S. at 15.

It is sufficient for present purposes to simply recognize that "enforceability" and "validity" are analyzed within *The Bremen*'s framework for deciding the extent to which a court will bind the contracting parties to their bargained-for language or otherwise ignore a forum-selection clause on fairness, contract-formation, or public-policy grounds. *See AQuate*, 100 F.4th at 1323. That is because "the effect of *The Bremen*'s test on forum-selection clauses" is not at issue in this appeal. *See id.* at 1323 n.4. The Plaintiffs do not ask us to nullify the forum-selection clauses in the Declan and RRA Contracts, and do not argue that those clauses are themselves the products or sources of any unfairness between the parties to them. Rather, they ask us to determine exactly who those clauses can be enforced by and against in the first place—*i.e.*, to whom they *apply*.

Our Circuit has not yet determined whether questions of a forum-selection clause's "applicability" or "scope," such as the extent to which the clause can bind a non-signatory party, are "distinct from and antecedent to [questions of] its enforceability." *Firexo*, 99 F.4th at 319 (emphasis omitted). We now hold that they are.

Before a court can assess whether the parties to a lawsuit should be bound by a forum-selection clause's terms, it must first know the extent to which the clause applies to the parties' claims at all. *See, e.g.*, *Slater v. Energy Servs. Grp. Int'l, Inc.*, 634 F.3d 1326, 1330–31 (11th Cir. 2011) (considering whether claims "fit within the scope of the . . . forum-selection clause" before determining clause's enforceability); 14D Chas. A. Wright & A.R. Miller, *Federal Practice and Procedure* § 3803.1 (4th ed. 2025) (distinguishing between issues of whether the "agreement [is] enforceable" and whether "the clause appl[ies] to the dispute at hand"). Delineating the scope of a forum-selection clause requires the court to assess whether the clause is "mandatory" or "permissive," *see Snapper, Inc. v. Redan*, 171 F.3d 1249, 1262 n.24 (11th Cir. 1999), whether it covers the causes of actions plead, *see Slater*, 634 F.3d at 1330–31, and whether it extends to the parties at bar, *see Usme v. CMI Leisure Mgmt., Inc.*, 106 F.4th 1079, 1087 (11th Cir. 2024). None of *The Bremen* factors we consider in analyzing a forum-selection clause's "enforceability" or "validity" provide any guidance for answering these questions. *Cf. AQuate*, 100 F.4th at 1322.

Instead, we can only determine a forum-selection clause's "scope" by looking to the language of the contract itself. *Slater*,

634 F.3d at 1330. This preliminary question of "[w]hether and how a [forum-selection] provision applies to the parties or claims in a lawsuit" thus presents a matter of "'interpretation[,] . . . analytically distinct . . . from the enforceability of that clause.'" *Firexo,* 99 F.4th at 310, 324 (quoting *In re McGraw-Hill Global Edu. Holdings LLC*, 909 F.3d 48, 58 (3d Cir. 2018)); *see Weber*, 811 F.3d at 770–71; *Martinez*, 740 F.3d at 217–18; *Yavuz*, 465 F.3d at 430. Accordingly, when tasked with analyzing a forum-selection clause, a court must follow a two-step approach: (1) the court first must interpret the clause to assess whether its terms apply to the claims and parties at bar; if they do, then (2) the court must decide whether the forum-selection clause is valid and enforceable based on *The Bremen* factors. Our precedent dictates that the enforceability of a forum-selection clause is a procedural matter governed by federal common law.[3] *See Stewart*, 810 F.2d at 1068. We next consider whether the same is true for the issue of applicability as well.

2.

Identifying the appropriate body of law that a federal court exercising diversity jurisdiction must apply in interpreting a forum-

---

[3] Picking up on the conceptual distinction between "enforceability" and "validity," some courts have identified the possibility that validity issues implicating the formation of a forum-selection clause should be resolved based on state contract law rather than federal common law. *See Barnett*, 831 F.3d at 301–03; *Nw. Nat'l Ins. Co. v. Donovan*, 916 F.2d 372, 374 (7th Cir. 1990). Because the parties do not challenge the validity of the forum-selection clauses, we need not weigh in on that issue today.

24-10913                Opinion of the Court                23

selection clause poses an issue of first impression for our Court.[4] Under *Erie*'s longstanding command, a federal court sitting in diversity must "apply state substantive law and federal procedural law," *see Garcia v. Chiquita Brands Int'l, Inc.*, 48 F.4th 1202, 1210 (11th Cir. 2022) (quoting *Gasperini v. Ctr. for Humans., Inc.*, 518 U.S. 415, 427 (1996)); *accord Erie*, 304 U.S. at 71.[5]

In our Circuit, it is "well settled" that issues of contract interpretation are substantive matters governed by state law. *AFC Franchising*, 43 F.4th at 1290 (citing *Fernandez v. Bankers Nat'l Life Ins.*, 906 F.2d 559, 564 (11th Cir. 1990)). And determining the applicability of a forum-selection clause is simply an exercise in interpretation. *See Slater*, 634 F.3d at 1330; *John Wyeth & Bro.*, 119 F.3d at 1073. Accordingly, our sister Circuits that have recognized the applicability-enforceability distinction uniformly apply the substantive law governing the contract to interpret a forum selection

---

[4] The Defendants assert that the "great weight of intra-circuit law" dictates that we apply federal common law when interpreting forum-selection clauses. But we have never spoken directly on this issue. Rather our cases addressing the applicability of forum-selection clauses either (1) assumed without deciding that federal law governs this question, *see Byers*, 701 F.3d at 1341; *Usme*, 106 F.4th at 1087; *Ocwen Orlando Holdings Corp. v. Harv. Prop. Tr., LLC*, 526 F.3d 1379, 1381 (11th Cir. 2008); *accord Snapper, Inc. v. Redan*, 171 F.3d 1249, 1262 & n.25 (11th Cir. 1999) (applying "ordinary contract principles" but declining to "address the question of which jurisdiction's law to apply"), (2) held only that the "enforceability" of a forum-selection clause is governed by federal-common law, *see Stewart Org.*, 810 F.2d at 1067; *AQuate*, 100 F.4th at 1323, or (3) did not implicate our diversity jurisdiction, *see Slater*, 634 F.3d at 1326.

[5] Foreign countries "must be considered just like a 'state' for *Erie* and choice-of-law purposes." *Garcia*, 48 F.4th at 1210.

clause's applicability.  *See Firexo*, 99 F.4th at 326; *In re McGraw-Hill*, 909 F.3d at 58; *Weber*, 811 F.3d at 770; *Martinez*, 740 F.3d at 217; *Yavuz*, 465 F.3d at 430.  We believe that approach is sound.

"Contract law—including the rules governing contract interpretation—is quintessentially substantive for *Erie* purposes, and therefore primarily the realm of the states."  *Martinez*, 740 F.3d at 221 (first citing *Alland v. Consumers Credit Corp.*, 476 F.2d 951, 954–55 (2d Cir. 1973); then citing *Avery v. Hughes*, 661 F.3d 690, 693–94 (1st Cir. 2011)).  Under our *Erie* framework, federal courts must apply the substantive law of a state "unless affirmative 'countervailing federal interests' are at stake that warrant application of federal law."  *Garcia*, 48 F.4th at 1210 (quoting *Gasperini*, 518 U.S. at 432).  We see no sufficiently pressing federal interests that justify departing from the standard "constitutional 'allocation of judicial power between state and federal systems established' in *Erie*."  *Martinez*, 740 F.3d at 221 (quoting *Hanna v. Plumer*, 380 U.S. 460, 474 (1965) (Harlan, J., concurring)); *cf. Erie*, 304 U.S. at 77 ("There is no federal general common law.").  On the contrary, upholding "valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system" in promoting efficiency and predictability in litigation.  *Stewart*, 487 U.S. at 33 (Kennedy, J., concurring); *cf. Martinez*, 740 F.3d at 220 ("Applying federal law to construe a forum selection clause could frustrate the contracting parties' expectations by giving a forum selection clause a broader or narrower scope in a federal court than it was intended to have.")  Thus, forum-selection clauses must be

interpreted like any other contractual provision: under the substantive law that governs the contract.

Resisting this conclusion, the Defendants assert that determining the applicability of the forum-selection clauses to the claims presented here "does not involve any 'interpretation,'" since it "requires no parsing of contractual language or textual analysis whatsoever." Not so. "*Every* application of a text to particular circumstances entails interpretation." A. Scalia & B.A. Garner, *Reading Law: The Interpretation of Legal Texts* 53 (2012) (emphasis added); *see also* H.T. Tiffany, *Interpretation and Construction*, *in* 17 *American and English Encyclopedia of Law* 1, 2 (Garland & McGehee eds., 2d ed. 1900) (defining interpretation as "the ascertainment of the thought or meaning of the author of, or the parties to, a legal document, as expressed therein, according to the rules of language and subject to the rules of law"). For instance, we cannot know that a plaintiff's claims "fit within the scope of the . . . forum-selection clause" without first looking to the words it comprises. *Slater*, 634 F.3d at 1330. And we cannot give those words any legal effect until we discern the substantive law governing their interpretation. *Cf. Martinez*, 740 F.3d at 220 (recognizing that "the same word or phrase could have a different meaning" depending on the applicable governing law).

Both the Supreme Court and our Circuit have held in the analogous context of arbitration agreements that the substantive rules guiding this interpretation must derive from "traditional principles of state law." *Lawson v. Life of the S. Ins. Co.*, 648 F.3d 1166,

1170–71 (11th Cir. 2011) (quoting *Arthur Andersen LLP v. Carlisle*, 556 U.S. 624, 631 (2009)); *cf. Vimar Seguros y Reaseguros, S.A. v. M/V Sky Reefer*, 515 U.S. 528, 534 (1995) ("[F]oreign arbitration clauses are but a subset of foreign forum selection clauses." (citation omitted)). These principles, the Supreme Court has told us, include the substantive rules of "state contract law regarding the scope of agreements (including the question of who is bound by them)" that dictate whether a contract can "be enforced by or against nonparties to the contract," such as the availability of "'estoppel.'" *Arthur Andersen*, 556 U.S. at 630–31 (internal quotation omitted) (quoting 21 R. Lord, *Williston on Contracts* § 57:19, at 183 (4th ed. 2001)). We have already recognized in dicta that this applies with equal force to forum-selection clauses, *see Usme*, 106 F.4th at 1087, and reaffirm that rule as part of our holding today. Thus, whether the Defendants may rely on equitable estoppel to bring the Plaintiffs' claims within the scope of the Declan and RRA Contracts' forum-selection clauses necessarily turns on the substantive law governing our interpretation of the contract.

The applicability of a forum-selection clause—like that of any contractual provision—presents a substantive issue that falls within the province of state contract law. *Erie* dictates that we must look beyond federal law to determine whether the Defendants can invoke the Declan and RRA Contracts' forum-selection clauses against the Plaintiffs.

The district court did not do that. Ignoring the doctrinal distinction between a forum-selection clause's applicability and its

enforceability—and the choice-of-law issue arising therefrom—the district court erroneously applied federal common law to allow the Defendants to invoke those clauses based on equitable estoppel. But a non-signatory's ability to rely on a contract's forum-selection clause turns on whether "the relevant state contract law allows him" to do so. *Lawson*, 648 F.3d at 1171 (first quoting *Arthur Andersen*, 556 U.S. at 632; then citing *Bd. of Trs. v. Citigroup Global Mkts., Inc.*, 622 F.3d 1335, 1342–43 (11th Cir. 2010)). So, having concluded that federal common law does not govern the forum-selection clause's applicability, we now must identify, under Florida state law, which jurisdiction's does.

3.

At this juncture we are presented with two Florida choice-of-law rules that identify the law governing contract interpretation. Under the first rule, Slovenian law governs the contracts' interpretation; under the second, Florida state law. Our task is to identify which rule, and thus, which jurisdiction's law, applies to interpreting the forum-selection clauses.

The first choice-of-law rule states that "Florida courts traditionally have applied the doctrine of *lex loci contractus*," which selects "the law of the state where the contract was made or to have been performed." *U.S. Fid. & Guar. Co. v. Liberty Surplus Ins. Corp.*, 550 F.3d 1031, 1033 (11th Cir. 2008) (citing *Shapiro v. Associated Int'l Ins. Co.*, 899 F.2d 1116, 1119 (11th Cir. 1990)), *opinion withdrawn sub nom. United States Fidelity & Guaranty Co. v. Liberty Surplus Ins. Corp.*, No. 08-10544, 2009 WL 10875291, at *1 (11th Cir. Feb. 26, 2009); *see,*

*e.g.*, *Sturiano v. Brooks*, 523 So. 2d 1126, 1129–30 (Fla. 1988). However, if a contract contains a choice-of-law provision, Florida courts generally will interpret the contract under "the law of the chosen forum" unless it "contravenes strong public policy." *Interface Kanner, LLC v. JPMorgan Chase Bank, N.A.*, 704 F.3d 927, 931–32 (11th Cir. 2013) (quotation omitted); *accord Mazzoni Farms, Inc. v. E.I. DuPont De Nemours & Co.*, 761 So. 2d 306, 311 (Fla. 2000) (citing *Punzi v. Shaker Adver. Agency, Inc.*, 601 So. 2d 599 (Fla. 2d DCA 1992)).

Here, the parties have "litigated on the assumption" that both the Declan and RRA Contracts contain choice-of-law clauses selecting Slovenian law to govern the contracts' interpretation, so we accept that premise. *Usme*, 106 F.4th at 1087; *see also Volt Info. Scis., Inc. v. Bd. of Trs.*, 489 U.S. 468 (1989) (assuming "choice-of-law clause meant what the [lower court] found it to mean"). Since the Defendants have not offered a reason why Slovenian law "contravenes strong public policy," this first choice-of-law rule, thus, dictates that the laws of Slovenia govern the interpretation of the contracts' forum-selection clauses. *See Interface Kanner, LLC*, 704 F.3d at 931–32.

The Defendants nonetheless argue that a second rule governing contract interpretation applies. They maintain that our interpretation of the forum-selection clauses still must be governed by Florida law—not Slovenian law—because of Florida's "general rule" that "whether the forum selection clause is valid and enforceable is a procedural issue that must be determined in accordance with the law of the forum state rather than the law of the state

designated in the agreement." *Golden Palm Hospitality, Inc. v. Stearns Bank Nat'l Ass'n*, 874 So. 2d 1231, 1234 (Fla. 5th DCA 2004). This argument may appear irrelevant at first blush, as our precedent squarely holds that issues of enforceability are "procedural questions to be resolved by federal law independent of forum state policy." *See Stewart Org.*, 810 F.2d at 1067. Resolving the effect of this rule, however, is not so simple.[6]

The Defendants are not invoking Florida's law for analyzing forum-selection clauses to displace federal law within our *Erie* analysis, but instead to displace Slovenian law once we have determined that Florida's substantive rules apply. *See McMahan v. Toto*, 256 F.3d 1120, 1133 (11th Cir. 2001) ("If we do determine that the matter is substantive, we examine the substantive law of the forum state, which includes its choice-of-law rules, to ascertain the applicable

---

[6] Indeed, a survey of the relevant literature demonstrates that the issue of whether a contract's chosen law also governs its forum-selection clause has consistently baffled scholars and courts. *See, e.g.*, Kermit Roosevelt III & Bethan R. Jones, *Adrift on* Erie*: Characterizing Forum-Selection Clauses*, 52 Akron L. Rev. 297, 314 (2019) ("*Erie* analysis has any number of vexing problems, but one of the most difficult is . . . the treatment of forum-selection clauses."); Tanya Monestier, *When Forum Selection Clauses Meet Choice of Law Clauses*, 69 Am. U. L. Rev., 325, 333 (2019) ("Things become considerably more complicated when forum selection clauses meet choice of law clauses."); Linda S. Mullenix, *Another Choice of Forum, Another Choice of Law: Consensual Adjudicatory Procedure in Federal Court*, 57 Fordham L. Rev. 291, 346–47 (1988) ("If forum-selection cases are somewhat unsettling in their analytical methodology, then forum-selection cases complicated by a concurrent choice-of-law provision are even more daunting.").

substantive law. . . . We note, however, that the two steps are independent of each other[.]" (citation modified)).

In other words, under *Erie*, we must apply Florida's choice-of-law rules—the substantive law that governs. That substantive law, in turn, categorizes some issues as procedural. *See Golden Palm Hospitality, Inc.*, 874 So. 2d at 1234. Specifically, under Florida's choice-of-law rules, matters deemed "procedural" must be governed by Florida law "even where another forum's substantive law applies." *McMahan* 256 F.3d at 1133 (citing *Aerovias Nacionales De Colom., S.A. v. Tellez*, 596 So. 2d 1193, 1194–95 (Fla. 3d DCA 1992)); *see also* 16 Am. Jur., *Conflicts of Laws* § 90 (2d ed. 2025) ("Under the general rule related to contractual choice-of-law provisions, courts apply the chosen state's law to substantive questions and the law of the court's state (the forum) to procedural matters.").

So, if Florida's substantive law views the "validity" and "enforceability" of a forum selection clause as procedural for choice-of-law purposes, we would first decide whether the "applicability" of a forum-selection clause falls under "validity" and "enforceability" under Florida law before interpreting the clauses. *See Md. Cas. Co. v. Williams*, 377 F.2d 389, 393 (5th Cir. 1967) ("The district court was required to apply to the construction of the contract the law which would be applied under [the forum state's] conflict of laws rules.").[7] If the issue before us—the "applicability" of the forum-

---

[7] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

selection clauses to the Defendant—is a question about the "validity" and "enforceability" of a forum-selection clause under Florida law, then the issue is procedural and it must be governed by Florida law "even where [Slovenia's] substantive law applies." *McMahan* 256 F.3d at 1133. If the issue is not considered procedural, then Slovenian law, as the "law of the chosen forum" would govern. *See Interface Kanner, LLC*, 704 F.3d at 931–32.

The Defendants necessarily assume that Florida courts mean something different than federal courts when referring to a forum-selection clause's "validity" and "enforceability"—else Florida's definition of these terms would not include "applicability" for the same reasons federal common law does not. *See McMahan*, 256 F.3d at 1131–32; *AQuate*, 100 F.4th at 1323 n.3. In their view, Florida courts' analysis of "whether the forum selection clause is valid and enforceable" extends beyond *The Bremen* factors to also include interpretive issues pertaining to the clause's scope. And because Florida courts look to Florida law to answer that question, they say, we are required to do so as well.

Although the Defendants are correct that we must follow Florida law to decide whether an issue is considered procedural, *McMahan*, 256 F.3d at 1133, we do not believe that Florida's "general" choice-of-law rule to apply forum law in analyzing a forum-selection clause extends to issues of interpretation.

Granted, the Florida Supreme Court has not spoken directly on this issue. "In the absence of any Florida Supreme Court decisions close enough on point, we look to decisions of the Florida

intermediate appellate courts and follow them unless there is some really persuasive indication that the Florida Supreme Court would go the other way." *KMS Rest. Corp. v. Wendy's Int'l, Inc.*, 361 F.3d 1321, 1325 (11th Cir. 2004) (first citing *McMahan*, 311 F.3d at 1080; then citing *Ernie Haire Ford, Inc. v. Ford Motor Co.*, 260 F.3d 1285, 1290 (11th Cir. 2001)). Approximately twenty-five years ago, some of Florida's intermediate appellate courts began treating the "procedural issue" of determining a forum-selection clause's "validity and enforceability" as encompassing both whether "the clause is enforceable and binding on the parties" *and* interpretive issues like "whether the clause is permissive or mandatory," *Golden Palm*, 874 So. 2d at 1236 (first citing *Shoppes Ltd. P'ship v. Conn*, 829 So. 356 (Fla. 5th DCA 2002); then citing *Aqua Sun Mgmt., Inc. v. Divi Time Ltd.*, 797 So.2d 24, 24–25 (Fla. 5th DCA 2001)); *Fendi S.r.l. v. Condotti Shops, Inc.*, 754 So. 2d 755, 757–58 (Fla. 3d DCA 2000). Accordingly, those courts applied Florida law in answering both questions "despite a choice of law provision in the contract" pointing to the law of another jurisdiction." *Golden Palm*, 874 So. 2d at 1234–35 (first citing *Fendi*, 754 So. 2d at 755; then citing *Manrique v. Fabbri*, 493 So. 2d 437, 439 (Fla. 1986)); *see Shoppes Ltd.*, 829 So. 2d at 358.

In first recognizing that rule, Florida's Third District Court of Appeal highlighted that the "majority of cases which do involve venue issues and questions regarding the validity of forum selection clauses have traditionally regarded such issues as 'procedural' and have applied the law of the forum rather than the law selected

24-10913                Opinion of the Court                33

by the parties." *Fendi*, 754 So. 2d at 757–58 (collecting cases).[8]  Curiously, the *Fendi* court distinguished those cases implicating "validity" from cases applying a contract's chosen law to issues "related to the interpretation and the scope of enforceability of the forum selection clauses," muddying its classification of interpretive issues. *Id.* at 757 n.4.

Despite the capacious approach that has found favor among the Florida intermediate appellate courts, we are persuaded that the Florida Supreme Court would hold that matters of interpretation fall outside the procedural inquiry into the validity and enforceability of a forum-selection clause.  To begin, the Florida Supreme Court has explicitly adopted *The Bremen*'s understanding of those terms. *See Manrique*, 493 So. 2d at 440 (We . . . adopt the view enunciated in [*The Bremen*.]").  That is dispositive for two reasons. First, *The Bremen* test for evaluating validity and enforceability, as we previously explained, does not address the anterior issue of applicability.  So, the "procedural issue" of determining a forum-selection clause's "validity and enforceability" necessarily excludes interpretation. *See Golden Palm*, 874 So. 2d at 1235.  Second, because the Florida Supreme Court has tethered this analysis to federal law,

---

[8] While "[t]his statement may have been sound when it was made, . . . judicial evolution on views of the interests of maintaining expectations of parties to a contractual relationship" has sparked a "recent trend[ ]" among courts to interpret forum-selection clauses under a contract's chosen law.  Kevin W. Bufford, Note, *Threshold or Procedural Issue: The Order of Interpretation Required by Contractual Choice-of-Law Provisions Versus the Law of the Forum Where the Suit Is Commenced*, 40 Am. J. Trial Advoc. 131, 151 (2016).

*Erie* dictates that we should assess the clause's validity and enforceability under federal law, thus avoiding the need to consult Florida's choice-of-law rules at all. *See Esfeld v. Costa Crociere, S.P.A.*, 289 F.3d 1300, 1306–07 (11th Cir. 2002) ("If no conflict exists, then the analysis need proceed no further, for the court can apply state and federal law harmoniously to the issue at hand." (quotation omitted)); *AQuate*, 100 F.4th at 1323 n.3 (applying federal law "because Alabama has adopted *The Bremen*'s test for the enforceability of forum-selection clauses").

But if that were not enough, the Florida Supreme Court has also indicated that a contract's chosen foreign law is relevant in interpreting a forum-selection clause. In *Garcia Granados Quinones v. Swiss Bank Corp. (Overseas), S.A.*, 509 So. 2d 273 (Fla. 1987), the Florida Supreme Court was tasked with determining whether a clause selecting Guatemala as the appropriate forum was mandatory in scope. Although the court ultimately interpreted that provision under Florida law, it did so because the petitioner had failed to establish "that the word 'may' as used in [the forum-selection clause] has some special meaning under Guatemalan law." *Id.* at 275. By highlighting that the chosen law could have been dispositive, the Florida Supreme Court signaled that the interpretation of a forum-selection clause falls outside the procedural matters which must be resolved by Florida law.

More generally, the Florida Supreme Court has expressly adopted as Florida's law the federal doctrine of *forum non conveniens*—which, of course, is what gives rise to the considerations of

forum-selection and choice-of-law provisions relevant here, as well as in *Manrique* and *Garcia Granados*. In *Kinney System, Inc. v. Continental Insurance Company*, 674 So. 2d 86 (Fla. 1996), the court expressly receded from its earlier *forum non conveniens* doctrine established in *Houston v. Caldwell*, 359 So. 2d 858 (Fla. 1978), which the court described as "less vigorous than the federal doctrine," *id.* at 88, and "adopt[ed] the federal rule of *forum non conveniens*," *id.* at 93. The court then codified its holding by adopting Florida Rule of Civil Procedure 1.061, stating in its own commentary to the rule that it "was added to elaborate on Florida's adoption of the federal doctrine of forum non conveniens in *Kinney* . . . , and it should be interpreted in light of that opinion." *Id.* at 95; In *re Amends. to Fla. Rule of Civ. Proc. 1.061 & Form 1.983*, 385 So. 3d 1038, 1039 (Fla. 2024).

*Manrique*'s adoption of *The Bremen* test, combined with *Garcia Granados*'s treatment of a contract's chosen law and the Florida Supreme Court's more general adoption of the federal doctrine of *forum non conveniens*, persuade us that the Florida Supreme Court would conclude that issues of interpretation are beyond the scope of the procedural inquiry into a forum-selection clause's "validity and enforceability." Florida's procedural rule to apply forum law in answering *that* question thus provides no basis for reading the forum-selection clauses in the Declan and RRA Contracts through the lens of Florida law.

Instead, we must follow Florida's choice-of-law rule to apply the contracts' "choice-of-law provisions unless the law of the

chosen forum contravenes strong public policy." *Mazzoni Farms*, 761 So. 2d at 311. The Defendants have offered no reason why interpreting the contract under Slovenian law would offend "some paramount rule of [Florida] public policy." *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So. 2d 1160, 1165 (Fla. 2006) (quotation omitted). Therefore, we conclude that Florida's choice-of-law rules dictate that the Declan and RRA Contracts, including their forum-selection clauses, are governed by the laws of Slovenia.

4.

Because Slovenian law governs all substantive matters pertaining to the Declan and RRA Contracts, the Defendants may only invoke the forum-selection clauses to the extent Slovenian law allows a non-signatory to do so. *See Arthur Andersen*, 556 U.S. at 630–31. Determining the law of a foreign jurisdiction is "a ruling on a question of law" which we retain discretion to undertake in the first instance. Fed. R. Civ. P. 44.1; *see, e.g.*, *Petroleos De Venez. S.A. v. MUFG Union Bank, N.A.*, 106 F.4th 263, 268–69 (2d Cir. 2024); *Firexo*, 99 F.4th at 328. In undertaking that inquiry, we may "consider any relevant material or source, including testimony." *Garcia*, 48 F.4th at 1211 (quoting Fed. R. Civ. P. 44.1); *see also* Chas. A. Wright & A.R. Miller, *Federal Practice and Procedure* § 2446 (3d ed. 2025) ("[A]ppellate courts have the same freedom to examine foreign-law materials as is given to the trial courts.").

To guide our understanding of Slovenian law, the Plaintiffs submitted a declaration by Professor Dr. Aleš Galič. Dr. Galič explains that Slovenian courts would apply European Union

Regulation 1215/2015 in analyzing the "jurisdiction agreements" in the Declan and RRA Contracts.  Pursuant to that law, parties to a contract can agree "to settle any disputes which have arisen or which may arise in connection with a particular legal relationship" in the courts of a designate Member State. Comm'n Regul. 1215/20, art. 25, 2012 O.J. (L 351) 1, 11 (EU).

The European Court of Justice—the rulings of which bind Slovenian courts on matters of EU law, *see, e.g.*, Thomas von Danwitz, *The Role of the Court of Justice in the Course of European Integration*, 42 Berkeley J. Int'l L. 45, 49–51 (2024)—has interpreted Regulation 1215/2015 to mean that jurisdiction clauses are generally only enforceable between the parties to the contract.  According to that tribunal:

> the principle, constantly reiterated by case-law, that the parties' consent is a condition of the effectiveness of the clause conferring jurisdiction leads inevitably to that solution. After all, the fact that there is no contractual relationship between [the parties at bar], inasmuch as they have not assumed any contractual obligations towards each other, supports the inference that they cannot be regarded as having 'agreed', within the meaning of [the regulation], to the court designated as having jurisdiction.

Case C-366/13, *Profit Inv. SIM SpA v. Ossi*, ECLI:EU:C:2015:274 ¶ 51 (Apr. 23, 2015).[9]  Slovenian caselaw reflects this restrictive approach to non-party enforcement.  *See* Decision of the App. Ct. in Ljubljana of Dec. 2, 2015, II Cp 1950/2015 ¶ 7 (Slovn.) (applying EU law to hold that "[n]o agreement on jurisdiction was concluded between the litigants" where respondent was not a party to contract containing jurisdiction clause).

The Defendants do not adequately rebut the Plaintiffs' characterization of Slovenian law.  In fact, they fail to brief this issue at all, and thus have abandoned "this issue . . . for the purposes of this appeal." *Beckwith v. City of Daytona Beach Shores*, 58 F.3d 1554, 1564 n.16 (11th Cir. 1995) (citing *Allstate Ins. Co. v. Swann*, 27 F.3d 1539, 1542 (11th Cir. 1994)); Fed. R. Civ. P 44.1 advisory committee's note to 1966 adoption ("[T]he court is free to insist on a complete presentation by counsel.").  And even if we were to consider the Defendants' expert submission on Slovenian law, *see Garcia*, 48 F.4th at 1211, none of the cases discussed therein suggest that a Slovenian court would allow a non-signatory to enforce a jurisdiction clause against a party to the original contract.

From our review of the parties' submissions, we are satisfied that Slovenian law does not allow the non-signatory Defendants to

---

[9] As a limited exception to this rule, a third party not privy to the original contract nonetheless can be bound to a jurisdiction clause where it "succeeded . . . the rights and obligations of one of the original parties."  Case C-352/13, *Cardel Damage Claims (CDC) Hydrogen Peroxide SA v. Evonik Degussa GmbH*, ECLI:EU:C:2014:2443 ¶ 108 n.125 (Dec. 11, 2014).  Nothing in the record indicates that exception applies here.

rely on the Declan and RRA Contracts' forum-selection clauses. Thus, the forum-selection clauses do not apply to the Plaintiffs' claims asserted in Counts I and II and cannot be invoked here.

5.

In the absence of an applicable forum-selection clause covering these claims, the district court abused its discretion in assessing *forum non conveniens* under *Atlantic Marine*'s modified test. That test—which gives no weight to the plaintiff's choice of forum or the parties' private interests—is relevant only when the parties' contract contains an applicable and enforceable forum-selection clause. *See Atl. Marine*, 571 U.S. at 63–65; *Usme*, 106 F.4th at 1086–87. And that is not the case here. Accordingly, the district court should have followed our "typical" *forum non conveniens* test—under which the defendant bears the burden of establishing that "(1) an adequate alternative forum is available, (2) the public and private factors weigh in favor of dismissal, and (3) the plaintiff can reinstate his . . . suit in the alternative forum without undue inconvenience or prejudice," *Usme*, 106 F.4th at 1085, rather than *Atlantic Marine*'s more defendant-friendly alternative.

Because the district court "applied the wrong legal standard" in its analysis, *AQuate*, 100 F.4th at 1320, it abused its discretion in dismissing Counts I and II for *forum non conveniens*. We therefore reverse the district court's dismissal of these claims and remand for the district court to conduct its *forum non conveniens* analysis under the proper test.

### B.    Count III

Both sides appeal aspects of the district court's ruling as to Count III, which is based on the Defendants' alleged tortious interference with RRA's Mesa Contract. According to RRA, the district court erred in finding this claim "conceded" in the briefing below and abused its discretion in deeming the second amended complaint an impermissible shotgun pleading. The Defendants, despite prevailing on the merits, cross-appeal the district court's threshold determination that personal jurisdiction exists over them for this claim. As we must "assure ourselves of our [personal] jurisdiction before reaching the merits of a case," we take up the Defendants' cross-appeal first. *Knepfle v. J-Tech Corp.*, 48 F.4th 1282, 1290 (11th Cir. 2022) (citing *Frank v. Gaos*, 586 U.S. 485, 492–93 (2019)).

We apply a two-step framework in determining whether personal jurisdiction exists over a defendant. First, "the court must determine whether the plaintiff has alleged sufficient facts to subject the defendant to the forum state's long-arm statute." *Del Valle v. Trivago GMBH*, 56 F.4th 1265, 1272 (11th Cir. 2022) (citation omitted). Second, "if the court determines that the forum state's long-arm statute has been satisfied, it must then decide whether the exercise of jurisdiction comports with the Due Process Clause of the Fourteenth Amendment." *Id.*

We need not venture beyond the first step here. The district court believed that the Defendants' alleged actions in inducing a breach of the Mesa Contract, "at least some of which unfolded in Florida," were "sufficient" to satisfy Florida's long-arm statute. Specifically, the court relied on the section of Florida's long-arm

statute that grants personal jurisdiction over a defendant who "[b]reach[es] a contract in [Florida] by failing to perform acts required by the contract to be performed in this state." Fla. Stat. § 48.193(1)(a)7. The district court also noted it was "satisfied that it has personal jurisdiction over Defendants through the forum selection clause of the Mesa Contract," which selects the courts of Citrus County, Florida, as the forum for adjudicating "any disputes related" to the contract.

The Defendants' cross-appeal challenges both purported bases for satisfying the long-arm statute. In their view, the long-arm statute's breach-of-contract prong is irrelevant here because the Defendants were not a party to the Mesa Contract and thus could not have "fail[ed] to perform [any] acts required by" it. *Id.* § 48.193(1)(a)7. And while the long-arm statute does allow for personal jurisdiction based on contractual consent, *see id.* § 48.193(1)(a)9, the Defendants argue that the district court did not undertake the required analysis—or even cite the relevant subsection—before concluding the Mesa Contract's forum-selection clause established personal jurisdiction.

RRA does not defend the district court's bases for finding the long-arm statute met; it concedes that the district court erred in relying on Fla. Stat. § 48.193(1)(a)7 and wholly disclaims Fla. Stat. § 48.193(1)(a)9 as "irrelevant." Having abandoned its defense of the reasoning below, *see Hi-Tech Pharms., Inc. v. HBS Int'l Corp.*, 910 F.3d 1186, 1194 (11th Cir. 2018), RRA instead argues that it has plead sufficient facts establishing personal jurisdiction based on the

Defendants' "[c]ommitting a tortious act within this state," Fla. Stat. § 48.193(1)(a)2.  The district court did not analyze personal jurisdiction under this prong of Florida's long-arm statute, and we decline to do so in the first instance.  *See MSP Recovery Claims, Series LLC v. Metro. Gen. Ins. Co.*, 40 F.4th 1295, 1306 (11th Cir. 2022).

For purposes of resolving this appeal, it is enough that the district court erred in concluding that Fla. Stat. § 48.193(1)(a)7 or the Mesa Contract's forum-selection clause conferred jurisdiction over the Defendants.  Because the district court did not adequately address the "issues relating to personal jurisdiction before reaching the merits" on Count III, it has not established its "power to bind a defendant with a ruling on the merits of the case."  *BCCI Holdings*, 119 F.3d at 940 (first citing *Madara v. Hall*, 916 F.2d 1510, 1513–14 & n.1 (11th Cir. 1990); then citing Chas. A. Wright & A.R. Miller, *Federal Practice and Procedure* § 1351, at 243–44 (2d ed. 1990)).  Under such circumstances, "we must vacate—not affirm—its judgment on the merits."  *Shatsky v. Palestine Liberation Org.*, 955 F.3d 1016, 1029 (D.C. Cir. 2020) (first citing *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 94–95 (2017); then citing Fed. R. Civ. P. 41(b)); *see also Lightfoot*, 580 U.S. at 95 ("A court must have . . . power over the parties before it (personal jurisdiction) before it can resolve a case." (citing *Ruhrgas AG v. Marathon Oil Co.*, 526 U.S. 574, 583–585 (1999))).  On remand, the parties may reassert their alternative arguments as to personal jurisdiction and the merits, should they choose to do so.

## IV.    CONCLUSION

For the reasons stated, we **REVERSE** the dismissal of Counts I and II for *forum non conveniens*, and the district court's finding of personal jurisdiction over the Defendants as to Count III. We **REMAND** for further proceedings consistent with this Opinion.

**REVERSED AND REMANDED.**